RICHARD B. MAZER, SBN 49632
Law Offices of Richard B. Mazer
99 Divisadero Street
San Francisco, California 94117
Telephone: (415) 621-4100
Facsimile: (415) 621-4111

MICHAEL N. BURT, SBN 83377
1000 Brannan St #400
San Francisco, CA 94103
(415) 522-1508

Attorneys for Defendant
CHRISTOPHER ABLETT

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 09-00749 RS |
| Plaintiff, | DEFENDANT'S SENTENCING MEMORANDUM |
| vs. | |
| CHRISTOPHER ABLETT, | |
| Defendant. | |
| _____/ | |

    Defendant's counsel submits this sentencing memorandum in response to the government's sentencing memorandum. There really is no issue as to the sentence Mr. Ablett is going to receive; he will be sentenced to life in prison without the possibility of parole. Knowing this reality, the government nonetheless chose to write a sentencing memorandum, under the guise of a suggested guideline correction that is meaningless, in order to once again belie the conduct and character traits of government counsel throughout the trial in this

case, namely to engage in unprofessional conduct that reflects an attitude that could best be described as a "sporting theory" of justice which allows their personal egos to trump their duty as prosecutors to be fair and honest officers of the court.

First, the prosecutors choose to hide their unprofessional conduct by "contending" that the defendant testified falsely and committed perjury in his testimony.  In the true style of prosecutors engaging in a sporting theory of justice, they now seek to turn a man's claim of self-defense into allegations of lies. They claim Mr. Ablett lied when he testified about being attacked by Guardado and his henchmen.  The government claims that Mr. Ablett testified "that there were multiple Hells Angels present at the time he shot Mr. Guardado."  First of all, Mr. Ablett never testified that "there were multiple Hells Angels present."  Mr. Ablett's testimony was that he believed there were other Hells Angels or their associates present at the scene of the incident based both upon his knowledge of how the Hells Angels would respond to reports of Mongols being present in an area that the Hells Angels considered to be their "turf", and upon Mr. Ablett's observations of other individuals after Guardado had confronted and assaulted him.

There was evidence from other witnesses that corroborated the reasonableness of Mr. Ablett's belief that he was under attack from the Hells Angels.  The record shows that there was testimony from several witnesses that other men were observed were observed to be with Mr. Guardado at the crime scene.  Joyce Yu, a prosecution witness and no friend of the defendant, testified she saw another man approaching the scene with purpose during the initial part of the struggle between Mr. Ablett and Guardado, and saw Mr. Ablett shot toward that other man.  Amie Marvel, another government witness, testified that another man approached her during the fight and yelled at her to leave the scene.  Other witnesses saw Guardado's son Dominic around the scene of the crime, who

1  approached close to the body while acting in a bizarre manner and then fled from
2  the scene without talking to police.  Was Dominic also involved in the attack on
3  Mr. Ablett?  He was seen near the body right after the shooting.  The government
4  has claimed that Dominic Guardado had never been interviewed, despite his name
5  being on the government's witness list. The record is that the San Francisco Police
6  Department did not attempt to interview Dominic because his uncle, and the
7  decesed's brother, Jose Guardado, a San Francisco police officer, said that
8  Dominic would not agree to an interview.  Another witness saw a man limping
9  away from the crime scene as if he had been shot in the leg.  At least one witness
10 testified to hearing more shots than one revolver could hold.

The government's memorandum simply ignores the objective evidence that Mark Guardado had backup when he attacked Mr. Ablett.  There was no testimony that the other backup vehicle driven by Guardado's coconspirators was blocking Ms. Marvel's truck and preventing her departure.  Once again, the government is overreaching and appearing to be protecting Dominic Guardado and others who were involved in the attack on Mr. Ablett.

Second, the government asserts that Mr. Ablett committed perjury about making false statements to maintain his freedom.  While it may be true that the prosecutor thought up a clever way to impeach Mr. Ablett and bring out the prior convictions which had previously been ruled inadmissible by the Court before trial, none of this was material to the events of September 2008, and was merely collateral to Mr. Ablett's claim of self-defense.

Third, the government claims that Mr. Ablett made "multiple efforts to paint the Mongols as a peace-loving group."  Mr. Ablett never testified that the Mongols were a peace-loving group.  There was no proof that Mr. Ablett ever received any money from the Mongols except some petty cash donated when he turned himself in to authorities in Oklahoma.  There was no evidence presented that Christopher Ablett had any knowledge of criminal activities committed by

other members of the Mongols while he was a member of the Mongols motorcycle club. Again, government counsel continues to act in an unprofessional manner before this Court.

Fourth Mr. Ablett never testified that the Modesto chapter of the Mongols Motorcycle Club was "somehow separate and distinct from the rest of the Mongols enterprise." There was no such testimony from Mr. Ablett; he testified that he had only been a member of the Mongols for less than a year before the incident and that he had infrequent contacts with members of the club chapters in Southern California. In fact, the evidence showed that during the time Chris Ablett was prospecting and then became a member of the club, up to the date of the incident, there was no evidence that any member of the Modesto Chapter was involved in the acts of racketeering alleged in the indictment. As to the Pacheco Park incident Los Banos in June 2008, the Court should review the testimony of Pastor Chris Casteneda, which provided a complete picture of what happened in the park that day, which was that members of the Hells Angels gang attacked members of the Mongols Motorcycle Club who were participating in an anti-gang rally organized by Pastor Casteneda.

Fifth, the government focuses on Mr. Ablett's flight after the shooting incident. In hindsight, it may have been a mistake to leave the scene, and Mr. Ablett eventually resolved that error in judgment by turning himself in. His motivation to flee, however, was based on his fear of a revenge attack by the Hells Angels, who bombed the residence of San Jose Mongol club member Robert Rios in retaliation for Guardado's death. Once Mr. Ablett learned the day after the shooting that Guardado's brother was a San Francisco police officer, he became fearful of being arrested by the San Francisco Police because of their reputation of collusion with the Hells Angels.

Sixth, the government ignores the violent character of Mark Guardado, and instead sought to portray him as a peace-loving family man. To be clear, Mark

Defendant's Sentencing Memorandum     4

Guardado was the "shot-caller" for Hells Angels gang activities in the western United States. According to the FBI affidavit of Agent Natalie Phelan for a wiretap application in 2005, the San Francisco chapter of the Hells Angels motorcycle gang had infiltrated the San Francisco Police Department and District Attorney's office. They controlled schemes to distribute methamphetamine in San Francisco and to extort local businesses in San Francisco for "protection" money. These businesses included the adult theaters and nightclubs in San Francisco and the auto-wrecking business in San Francisco. By wearing the "Filthy Few- 666" patch on his vest, Guardado was a self-proclaimed killer who supposedly killed a Hells Angel associate suspected of being a police informant. He had been repeatedly arrested for assault and possession of various firearms. He beat up a policeman in New Hampshire in 2000. He beat up and attempted to kidnap a man in Concord, California in 1991. He beat up an innocent patron in a bar in Sturgis, South Dakota in the summer of 2007. He beat up an innocent patron in a bar in Petaluma, California in February 2008. He was out on bail on that charge when he was arrested in San Francisco in the summer of 2008 for possession of dangerous drugs. He was still out on bail when he attacked Mr. Ablett in September 2008. There can be no doubt that Guardado's intent when he approached Mr. Ablett was to commit a violent crime in aid of racketeering, the very crime for which Mr. Ablett has been convicted. Yet the government refers to Guardado's actions that night in the benign language of trying to "handle intruders." By the government's logic, Mr. Ablett brought this on himself by "intruding" into a public street and bar in San Francisco. The government's sentencing memorandum ignores the extremely violent nature of Mark Guardado. The Court's erroneous rulings on the admissibility of the violent character of Mark Guardado kept the jury from knowing the truth about Mark Guardado, and the government seized on that opportunity to paint a false picture of Mark Guardado before the jury, which the government continues to pursue to this day.

1    Seventh, the government contends that Mr. Ablett committed perjury
2 regarding his reasons for calling other club members after the shooting incident.
3 He testified that he was scared after the shooting because he had shot a Hells
4 Angels, and he was fearful of the Hells Angels and sought help about what he
5 should do next.  The telephone records reflect a pattern of Mr. Ablett trying to call
6 persons who might help protect him from the Hells Angels gang.  While Mr.
7 Ablett may have made some poor decisions after the shooting by engaging in
8 flight, he was truly scared and was not calling up friends to boast of shooting a
9 Hells Angel and seeking some recognition or compensation from the club.
10   Eighth, the government urges the Court to impose harsh punishment upon
11 the defendant for being a member of the Mongols Motorcycle Club.  "..[T]here can
12 be no mitigation for groups of criminals who inflict death on each other - and
13 often innocent bystanders - over juvenile colors, insignias, patches and devotion to
14 false 'brotherhood' that only retards the individuals' mental and emotional growth
15 and well-being."  Frankly, government counsel should be careful in who they refer
16 to as "juvenile", as that term aptly fits their own behavior in this case.  One of the
17 prosecutors  spent time during trial recesses chatting casually with one of
18 Guardado's sons as if they were old friends.  The other prosecutor's  repeated
19 behavior of shaking of his head to show the jury his opinion of testimony
20 favorable to the defense was a highly unprofessional comment on the evidence.
21 Now, the prosecutors use their sentencing memorandum to make more false
22 accusations about defendant's testimony, when such issues have no effect on the
23 outcome of the sentencing hearing.  This recent barb by the government is but one
24 more exercise in their "sporting theory" approach to prosecution.  Their continuing
25 overzealous behavior throughout this trial should be an embarrassment to the
26 government.
27
28

Defendant's Sentencing Memorandum            6

Finally, this sentencing warrants a brief comment on the "enterprise" theory of prosecution of the Mongols motorcycle club as a RICO criminal enterprise. A law that was designed to pursue the Mafia and organized crime syndicates has now been twisted by the government into a alleged RICO enterprise in a manner witch abuses the intended purpose of the RICO statute. It is not against the law to be a Mongol the First Amendments right to freedom of association protects membership in the Mogols Motorcycle Club. These men are living a lifestyle that is as American as the Cowboy. There will probably still be a Mongols Motorcycle Club long after Mr. Ablett passes from this earth, whether that be in prison or in freedom and vindication.

It is clear that this Court has no choice but to sentence Mr. Ablett to life imprisonment; the mandatory punishment is absolute. The government should not be wasting this Court's time by engaging in more juvenile and unprofessional behavior in this case.

Dated: May 14, 2012          Respectfully Submitted,

/s/RICHARD B. MAZER
MICHAEL N. BURT
Attorneys for Defendant
CHRISTOPHER ABLETT